## IWAZO YAMASHITA v. CLARK, Atty. Gen. Civ. No. 709.

District Court, Hawaii.
Jan. 7, 1948.

Wilfred C. Tsukiyama, of Honolulu, T. H., for plaintiff.

David L. Bazelon, Asst. Atty. Gen., Thomas E. Harris, Chief Litigation Branch, and George B. Searls, Chief Trial Atty., both of Washington, D. C., Ray J. O'Brien, U. S. Atty., for District of Hawaii, of Honolulu, T. H., and George W. Jansen, Chief Trial Atty., Office of Alien Property Department of Justice, of Washington, D. C., for defendant.

McLAUGHLIN, District Judge.

In this case on November 14, 1946, the Government's motion for judgment on the pleadings was granted. Thereafter while reducing the oral ruling to writing the decision of the circuit court in Uebersee Finanz-Korporation A. G. v. Markham, App.D. C., 1946, 158 F.2d 313, became available. As it cast doubt upon the correctness of the ruling, upon notice to the parties it was set aside and briefs were requested. Before the final brief was filed, the Supreme Court granted certiorari in the Clark, Attorney General v. Uebersee Finanz-Korporation case, 330 U.S. 813, 67 S.Ct. 772, and it was decided to await the decision of that Court. Subsequent to submission of the Uebersee case, the Supreme Court at the close of its last term called for re-argument at its present October 1947 term. On Dec. 8, 1947, the Supreme Court rendered its Uebersee decision, 68 S.Ct. 174, 177, a copy of which became available locally Dec. 15.

As I read that decision, the Supreme Court has decided that the 1941 amendment to § 5(b) of the Trading with the Enemy Act, 50 U.S.C.A.Appendix, § 5(b) (1), also 12 U.S.C.A. § 95a, Dec. 18, 1941, 55 Stat. 839, did not by necessary implication amend § 9(a) of the Act so as to read that the right to sue runs only to "any person not an enemy or ally of enemy *or national of any foreign country*" [emphasis added], but left § 9(a) intact. However, the Court believed that since the amendment either § 9(a) or § 2 must be read differently than before, even though neither section was directly amended. And it felt it " * * * more consonant with the functions sought to be served by the Act to apply § 2 differently than it was previously applied than to read § 9(a) more restrictively. We believe a more harmonious reading of § 2, § 5(b) and § 9(a) is had if the concept of enemy or ally of enemy is given a scope which helps the amendment of 1941 fulfill its mission and which does not make § 9(a) for the first time in its history and contrary to the normal connotation of its terms stand as a barrier to the recovery of property by foreign interests which have no possible connection with the enemy."

Accordingly the Court, affirming the court below, held that a Swiss corporation, although its property had been properly seized as that of a foreign national under § 5(b) (1), could sue, there being no enemy taint, as a friendly alien under § 9(a).

Under the Uebersee decision, since § 5(b), as amended in 1941 amends § 2 so as to necessitate a reading of it which is harmonious with the objective of the 1941 amendment, the plaintiff here cannot sue under § 9(a) if there is an "enemy taint."

As will appear below, an enemy taint could legally exist here only if the plaintiff had been specifically determined by the Custodian to be a national of a designated enemy country for the purpose of the Trading with the Enemy Act and Executive Order No. 9095, as amended, 50 U.S. C.A.Appendix, § 6 note. But such is not the pleaded fact. Indeed it is squarely denied. There is, therefore, no bar to plaintiff's suit even though he be in fact a national of Japan living in the United States. See Vesting Order No. 2705 (Exhibit III of complaint), which in no way mentions the plaintiff.

Upon the Government's first point (infra) at least, therefore, the oral ruling remains abrogated.

A previously prepared and recently amended opinion follows.

### Statement of Facts

This statutory action was brought under § 9(a) of the Trading with the Enemy Act, 50 U.S.C.A.Appendix, § 9(a), against the Custodian, whom the Attorney General has succeeded by Executive Order No. 9788, 50 U.S.C.A.Appendix, § 6 note, 11 F. R. 11981.

The defendant moved for judgment upon the pleadings upon the ground that the plaintiff had failed to state a claim upon which relief could be granted, Federal Rules of Civil Procedure, rules 12(c) and 12(h), 28 U.S.C.A. following section 723c, in that

(a) It affirmatively appeared that the plaintiff was under § 5(b) of the Act a foreign national;

(b) The relief sought was specific performance of a conditional sales contract, and the United States had not consented by § 9(a) to be sued on such a basis; and

(c) It appeared that the plaintiff was in default on the conditional sales contract; that the Custodian had vested the vendor's interest, repossessed the property, and rescinded the contract.

The facts as against the motion are derived from the complaint and are briefly as follows:

1. The plaintiff is a subject of Japan who has resided in the United States continuously since 1906, and is not an enemy, ally thereof or national of a designated enemy country as those terms are defined by the Act and Executive Orders issued thereunder.

2. On July 10, 1941, plaintiff contracted with Daizo Yamashita, his brother, to buy for $25,000 the latter's dairy. The contract was a conditional sales contract which provided that time was of the essence of the contract and that in case of default by the plaintiff with regard to the monthly payments of $750, the vendor with or without notice or legal action could repossess the dairy which would effect a rescission of the contract, and that in that event all payments previously made by the vendee could be retained by the vendor as liquidated damages without prejudice to other rights or remedies the vendor might have. No bill of sale was to be given the plaintiff until final payment had been made.

3. The vendor, Daizo Yamashita, also a subject of Japan, departed from the United States for Japan soon after the date of the contract, and resided there when on August 20, 1941, the first payment became due.

4. The plaintiff did not make the first or any payments under the contract. Under then existing orders of the Secretary of the Treasury sending money to Japan was prohibited unless licensed. By letter dated August 26, 1941, in Japan sent via Shanghai, China, the vendor, Daizo Yamashita, requested the plaintiff to withhold payments for—the complaint says—"the duration." It was said in argument that the interesting use of this phrase actually had reference to the United States Treasury Department's Freeze Order which by Executive Order No. 8832, dated July 26, 1941, had become effective as to assets in the United States of nationals of Japan as of June 14, 1941—Executive Order No. 8389, dated April 10, 1940, 5 F.R. 1400 as amended by Executive Order No. 8832, 12 U.S.C.A. § 95a note, 6 F.R. 3715.

5. Since July 10, 1941, the plaintiff paid $1,828.18 to the vendor's son to defray the cost of his education in Mainland United States.

6. On December 2, 1943, the Custodian vested by Order No. 2705 all of Daizo Yamashita's property in the United States.

7. On April 12, 1944, a copy of the vesting order was served upon plaintiff, and thereupon the Custodian took possession of the dairy.

8. The plaintiff is now ready to pay the full purchase price for the dairy as provided for in the contract, or the balance due if he is credited with payments made to vendor's son, with interest, if the Government will, pursuant to court order, restore the plaintiff to possession, account, and otherwise perform the vendor's part of the contract.

Conclusions of Law

Upon these facts it is concluded as a matter of law that

1. The plaintiff, being not an enemy, ally of enemy or national of a designated enemy country as those terms are defined by the Act and Executive Orders issued thereunder, may sue under § 9(a) of the Trading with the Enemy Act.

2. However, as § 9(a) of the Act confers no jurisdiction upon the court to order specific performance by the United

States of a conditional sales contract (point now moot, see infra); and as

3. The plaintiff as of April 12, 1944, was in default under the contract, the terms of which, prior to August 1941, had been frozen by Executive Order No. 8389, as amended; the United States by Vesting Order No. 2705 had succeeded to the vendor's rights under the contract and had a right to rescind it by retaking possession of the property. Whether by the vesting order the Custodian in behalf of the United States exercised this and other rights under the contract to which it succeeded is doubtful as such was not the tenor of the order. However, as the plaintiff had made no payments under the contract and stood in default, he had no interest in the property upon the date when the Custodian vested it as property of Daizo Yamashita's, irregular payments to the seller's son having not been made under and in accordance with the terms of the contract.

## Opinion

I. Section 5(b) of the Trading with the Enemy Act was amended by the First War Powers Act of December 18, 1941, Title III, § 301, 50 U.S.C.A.Appendix, § 5(b) also 12 U.S.C.A. § 95a giving to the Government the power exercisable during time of war or other period of national emergency "peremptorily to reduce to its possession and apply to its use, at moments critical in its history, all property which lies within its power * * *." Silesian-American Corporation v. Markham, 1946, 2 Cir., 156 F. 2d 793 at page 798. See also to the same effect the Uebersee and Silesian American decisions of the Supreme Court dated December 8, 1947.

By Executive Order No. 9095, March 11, 1942, 7 F.R. 1971, as amended by Executive Order No. 9193 dated July 6, 1942, 7 F.R. 5205, the President delegated to the Alien Property Custodian the power to vest in the United States all right, title and interest in and to property of foreign countries and nationals thereof under the terms and conditions described in the Order.

Pursuant to the powers above indicated, the Alien Property Custodian vested in the United States the property belonging to Daizo Yamashita, who as of that date was residing in Japan, an enemy country. See Executive Order No. 9193 amending No. 9095, § 10, supra, and Executive Order No. 8389, § 5, subd. E(i), as amended, 50 U.S. C.A.Appendix, § 6 note and 12 U.S.C.A. § 95a note.

Beyond all question Daizo Yamashita was both an enemy alien within the meaning of § 2 of the Act and also a national of a designated enemy country within § 5 (b) of the Act and Executive Order No. 9095 as amended by Executive Order No. 9193. The plaintiff, however, was neither although in fact he is an alien Japanese who came to the United States in 1906 and has resided here constantly since that date.

The finespun web encasing alien property matters is not easy to untangle, especially since with new laws and executive orders the Custodian's methods of procedure differed in World War II from those followed by him in World War I.

It is very easy to lose sight here of the fact that it was Daizo Yamashita's property which was seized, not plaintiff's. The plaintiff without any enemy labels under the Act simply claims an interest in the validly vested property of another.

Under § 2 of the Act if the national interest required, the President could bring within the meaning of "enemy" or "ally of enemy" any person—except a citizen— wherever resident. The President did not do this in either World War I or World War II, as modern warfare dictated the use of other and more effective means.

Under § 5 (b) of the Act as amended by Executive Order No. 9095, as amended by Executive Order No. 9193, any person, including a citizen (see Draeger Shipping Co. v. Crowley, D.C.N.Y., 49 F.Supp. 215, and 55 F.Supp. 906), for the purpose of the Trading with the Enemy Act regardless of residence could be brought within the meaning of the term "national" of a "designated enemy country" by a specific finding and determination by the Custodian that such was necessary in the national interest. Section 10 of amended Executive Order No. 9095 limited the broad provisions, in this regard, of Executive Order No. 8389 which it incorporated.

Because he was a subject of and also in a designated enemy country, by Vesting Order No. 2705 Daizo Yamashita was, as previously stated, determined by the Custodian for the purposes of the Act to be a national of a designated enemy country. He was also an enemy alien under § 2 of the Act.

But the Custodian never found that national interest required that he find and determine under amended Executive Order No. 9095 the plaintiff to be a "national" of a "designated enemy country." In this important respect this case differs from Fujino v. Clark, 1947, D. C. Hawaii, 71 F. Supp. 1.

■ The plaintiff's legal status being not that of an enemy, ally thereof, or national of a designated enemy country, he is not barred from suing under § 9 (a) of the Act.

■ II. Suits such as this under § 9 (a) of the Act against the Custodian are, as has been held innumerable times, suits against the United States, and consequently the plaintiff must come squarely within the terms of the sovereign's consent to be sued. Cummings v. Deutsche Bank, 1937, 300 U. S. 115, 57 S.Ct. 359, 81 L.Ed. 845. Section 9 allows suits to establish the interest, right or title in any money or property seized or vested by the Custodian, or to recover a debt owing by a person whose property has been seized or vested.

The theory upon which this plaintiff sues is that he has an interest in the property of Daizo Yamashita, which the Custodian vested.

■ Under point III it will be seen that plaintiff has no interest in the vested property, but assuming for the moment that he has, he seeks specific performance by the Custodian of the vendor's part of a conditional contract to sell a dairy. It does not seem to me that by § 9 of the Act the sovereign has consented to be sued upon such a basis. The sovereign's consent to be sued is strictly construed. United States v. Sherwood, 1941, 312 U.S. 584, 61 S.Ct. 767, 85 L.Ed. 1058.

Since the submission of this case and specifically on Dec. 18, 1947, because of the fact that the dairy has been losing money and is in an insolvent condition by a stipulation of the parties preserving plaintiff's rights, if any, with the approval of the Court the defendant is about to sell the dairy at public auction. When this transpires, the point under consideration becomes moot. So in reality the only issue remaining is whether or not the plaintiff has an interest in the transformed assets in the Custodian's hands. The type of relief prayed for is no longer a problem.

III. (a) Upon the pleaded facts the Government claims that as a matter of law the July 10, 1941, sales agreement was void and hence the plaintiff acquired no interest in the property.

The theory is that this was an unlicensed transaction by a foreign national—Daizo Yamashita—and prohibited by the Treasury Department's Freeze Order. See Executive Orders Nos. 8832 and 8389 effective as to Japan June 14, 1941, although so ordered July 26, 1941, 6 F.R. 3715, and Regulations of the Secretary of the Treasury § 130.2 (c), 6 F.R. 2905. The "sales agreement" it is said was a dealing in "property" as defined by the Regulations, and it was a dealing in property by a foreign national who had his interest in the property on the effective date of Executive Order No. 8389.

It is argued in aid of this contention that General License No. 54, 11 F. R. 5861, did not authorize this contract because the seller was a "blocked" national (so was the plaintiff) and his interest in the property had not been extinguished prior to the extension of Executive Order No. 8389 to Japan as of June 14, 1941, but see General License No. 54 as originally issued, 6 F.R. 3722. So, too, as to General License No. 42, 6 F.R. 2907, issued June 14, 1941, because it is claimed the seller, Daizo Yamashita, was not domiciled in the United States at all times since June 14, 1941.

■ Although here the buyer and seller were both "nationals" of a blocked or designated "foreign country" as those terms were defined by Executive Order No. 8389 for the purpose of controlling foreign funds, nevertheless the transaction—the contract of sales—was not the type of commercial operation prohibited by the Order. This was not a dealing in an "evidence of indebtedness" or "of ownership" by a foreign national, but was the creation of such.

evidence. See Sections 1 and 2 of Executive Order No. 8389. The Order was aimed basically at domestic and foreign exchange transactions conducted through banking institutions and such other commercial operations as might tend to secret foreign owned assets and/or enable them to flow to designated foreign countries to the detriment of the United States. This open recorded sales contract bears none of the characteristics of any one of the prohibited transactions and it cannot be made to look as if it was a prohibited transaction simply because thereafter the seller became domiciled in Japan. The prohibitory Treasury yardstick of Executive Order No. 8389 simply does not clearly and without distortion apply to this sales agreement, and consequently it is not void. In any event General License No. 42, 6 F.R. 2907, as of the date of the sales contract would appear to sanction the transaction, as on that date both buyer and seller had been and were domiciled and residing in the United States, and as originally promulgated General License No. 54, 6 F. R. 3722, would also seem to sanction the transaction.

(b) The sales agreement being valid, the next question is as to the effect thereafter of the seller then in Japan by letter dated Aug. 26, 1941, waiving "for the duration" the prompt monthly payments by the buyer called for by the terms of the contract.

Of course it is conceded that unless some Treasury regulation prohibited it the seller could waive his right to the stipulated monthly payments or any rights resulting from defaults thereof. And it is the fact that the buyer defaulted upon the very first payment due Aug. 20, 1941, because, it is alleged, of his inability, under the Treasury Freeze Order, to send the payment to the seller then in Japan.

The only sense that the seller's words "for the duration"—if he used them as distinguished from the pleader—made in August 1941 is that because of the Freeze Order the seller would not expect payments due on the contract while the prohibition against foreign exchange to Japan existed.

■ It is at this point—the sales agreement now being in existence—that I believe the Government's position that Treas-

ury regulations had frozen the contract in its original condition and placed it beyond the power of the parties to alter it to be sound.

At this point the sales agreement was "property" and the seller's attempt to deal with it as a blocked foreign national can be said to be a dealing in an evidence of indebtedness or of ownership of property. Executive Order No. 8389, § 1, subd. E and Secretary of the Treasury Regulations § 130.2 (c), 6 F.R. 2905, defining "property" as including "vendor's sales agreements."

In this state of affairs in order to deal with this existing evidence of indebtedness or ownership, the seller had to operate under a license granted by the Treasury. He had no specific license and General License No. 42, 6 F.R. 2907, did not sanction the seller's act as he was not then domiciled and residing in the United States and the general license ran only to nationals who were domiciled and residing in the United States on and since June 17, 1940.

Upon these facts the application of the indicated executive orders and regulation appears more sensible. The situation had become one wherein a national of a designated foreign country since he could not receive his money in Japan because of the United States Freeze Order took, or rather attempted to take, steps to place it beyond the reach and power of the United States by so altering the contract that the money due him would not be payable until government controls were removed.

On Aug. 20, 1941, when the first payment was due and unpaid, the plaintiff was in default. He was not then relying upon the seller's attempted waiver of monthly payments for he had not received the seller's letter of waiver. Failure to make the first and subsequent payments called for by the contract the plaintiff alleges to have been due to steamship difficulties making it impossible to send money to the seller in Japan. As a matter of fact and of law, also, the plaintiff could not send money to Japan in August 1941 because of the Freeze Order. However, in protection of his position under the contract pursuant to General License No. 1, 6 F. R. 2907, the plaintiff could and should have opened a blocked

58

account in the seller's name in a bank and made his monthly payments into it.

But it is said the Custodian by his Vesting Order did not purport to be vesting and exercising the seller's contractual right to rescission and possession. He, it is argued, vested the dairy as Daizo Yamashita's property in apparent ignorance of both the contract of sale and the plaintiff's default under it.

In this regard the plaintiff would seem to be correct. But whether this be so or not, or whether possession taken by the Custodian was for any and all purposes advantageous to the United States, is an interesting point but not necessary, as I see it, to a disposition of this case.

What is important is that on the date of vesting in December 1943 the plaintiff, having made no payments under the sales contract, had not then and has not now any interest in the vested property or in the proceeds therefrom. He cannot recover by pointing to weaknesses in the Government's position.

Having failed to set forth in the pleadings a claim upon which relief could be granted, judgment upon the pleadings may be entered for the defendant.

The form of judgment may be settled upon notice.